**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAYDEN REESE WILLIS, | ) | CASE NO. 1:25-CV-1989 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.     INTRODUCTION

The Commissioner of Social Security denied Plaintiff Jayden Reese Willis's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Mr. Willis seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consents and Order, ECF No. 6.)

For the following reasons, the Court AFFIRMS the Commissioner's decision denying Mr. Willis's application for benefits.

## II.     PROCEDURAL HISTORY

In May 2023, Mr. Willis applied to the Social Security Administration (SSA) seeking DIB and SSI.[1] (Tr. 175–76.) He claimed that he became disabled on September 15, 2003. (*Id*.) He claimed four allegedly disabling conditions: (1) "severe language disorder (math)"; (2) dyspraxia; (3) learning disability; and (4) language disorder impacting receptive skills. (Tr. 225.)

---

[1] The administrative transcript appears at ECF No. 7. The Court will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 175"). The Court will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7') and page-identification numbers (e.g., "PageID# 681").

1

The SSA denied Mr. Willis's application initially and upon reconsideration. (Tr. 73, 93.) Mr. Willis requested a hearing before an administrative law judge ("ALJ"). (Tr. 118.) The ALJ held a hearing on July 13, 2024, at which Mr. Willis was represented by counsel. (Tr. 35.) An independent vocational expert also testified at the hearing. (*Id*.)

On July 13, 2024, the ALJ issued a written decision finding that Mr. Willis is not disabled. (Tr. 12–28.) Mr. Willis requested review of the ALJ's decision. (Tr. 168.) The Appeals Council denied review in July 2025. (Tr. 1.)

On September 18, 2025, Mr. Willis filed his Complaint, challenging the Commissioner's final decision that is not disabled. (ECF No. 1.) Mr. Willis asserted the following assignment of error for review:

> The ALJ erred by failing to adequately develop the record regarding the consultative examination and subsequent opinion of Dr. Faust, which she found inadequate.

(Pl.'s Merit Br. at 7, ECF No. 9, PageID# 666.)

### III.  BACKGROUND

#### A.  Personal, Educational, and Vocational Experience

Mr. Willis was born in September 2003 and was 19 years old on the date of his application. (Tr. 175.) He graduated from high school and took several courses at a community college. (Tr. 41–42.) He is currently employed as a cart attendant and bagger for a grocery store, where he works between 18 and 30 hours per week. (*Id.*) He previously worked as a dishwasher at a cake shop, doing janitorial work, and maintaining stock at a clothing store. (Tr. 283.)

Mr. Willis lives with his father. (Tr. 40.) He does not have a driver's license. (*Id.*) He travels by bus and said that he has no problems taking the bus. (*Id.*)

2

### B.  Function Reports

In July 2023, Mr. Willis submitted a function report as part of his application for benefits. (Tr. 233–41.) He wrote that his language deficit affects his ability to complete tasks and follow instructions, though he said he can follow simple instructions. (*Id*.) He can pay attention "as long as he needs to." (*Id*.)

Mr. Willis said he does not handle stress very well but "can handle some stress." (*Id*.) He can adjust slowly to changes in routine. (*Id*.) He "get[s] along easily" with authority figures. (*Id*.) He is able to complete chores such as laundry, vacuuming, ironing, and mowing the lawn, and he does not need help or encouragement to accomplish these tasks. (*Id*.) He is able to prepare simple meals like sandwiches and frozen dinners. (*Id.*)

Mr. Willis communicates with others by text messaging, and he goes with his father to see a movie once a month. (*Id.*) He described his social life as "very limited." (*Id.*) But he enjoys watching television, spending time on the internet, reading, and listening to music. (*Id.*) He indicated that he is able to pay bills, count change, and handle a savings account, although he wrote that he has a "limited ability to make computations." (*Id.*)

Mr. Willis does not take any medication. (*Id.*) He has no trouble seeing to his personal care. (*Id.*)

### C.  Relevant Hearing Testimony

#### 1.  *Mr. Willis's Testimony*

Mr. Willis testified that he completed high school. (Tr. 41.) He has trouble with reading comprehension, and he struggled with some of his community college coursework, enlisting the aid of a tutor to help with his writing. (Tr. 41–42.) He earned grades of Bs and Cs in that college coursework, earning an A in his business class. (*Id.*)

Mr. Willis testified that he is currently working as a cart pusher at a grocery store, earning $11.50 an hour. (Tr. 42.) He works 18 hours a week in six to eight hour shifts, with his weekly hours increasing up to 30 hours during busy times. (Tr. 42–43, 47–48.) Though he struggled with the job initially, he currently does not have a problem completing his job tasks, having received help from a co-worker. (*Id.*) It took him a "couple days" to learn what he needed for the job. (*Id.*)

Mr. Willis testified that he believes he would be able to work a full-time job. (*Id.*) He takes the bus to his job, as he does not drive. (Tr. 48.)

Mr. Willis testified that he has never lived by himself, but he said that he believed he would be able to live alone. (Tr. 47.) He further explained that while he had issues with taking care of routine hygienic maintenance when he was younger, he now has no problems with tasks such as brushing his teeth or showering. (Tr. 46.) He is able to do his laundry and choose outfits to wear without any issue. (*Id.*)

Moreover, he testified that he is able to go grocery shopping by himself, although he more routinely shops with father. (Tr. 48–49.) When alone, he is able to solicit help from store employees if he has trouble finding something he needs. (*Id.*) He prepares at least some of his own meals, and he is able to use the microwave effectively. (Tr. 44–46.) He does not use the stove or oven. (*Id.*)

Mr. Willis enjoys going for walks when the weather is nice; he has no trouble crossing the street safely and is not concerned about his safety. (Tr. 50.) He has no physical issues, such as issues with walking, standing, lifting, or going up and down stairs. (*Id.*) He enjoys watching videos on the internet and playing video games, hobbies that he can do for hours at a time. (44–47.)

### 2. *Vocational Expert's Testimony*

Allison K. Reno testified as a vocational expert ("VE") at the hearing. (Tr. 51.) The ALJ asked the VE to assume that a hypothetical individual with Mr. Willis's age and education is

4

capable of work at all exertional levels, with additional limitations. (Tr. 52.) Specifically, this individual cannot perform work that requires a specific production rate such as assembly line work or meeting an hourly production quota. (*Id.*) They can meet production requirements that allow them to work at a flexible and goal-oriented pace. (*Id.*) They can maintain enough focus, persistence, concentration, pace, and attention to complete tasks in two-hour increments throughout a standard eight-hour workday. (*Id.*) They are able to deal with occasional changes in a routine work setting and can tolerate occasional interaction with supervisors, coworkers, and the general public. (*Id.*) They are able to understand, remember, and carry out simple instructions. (*Id.*)

The VE testified that such a person could perform certain jobs, such as a warehouse worker (DOT 992.687-058), linen room attendant (DOT 222.387-030), and counter supply worker (DOT 319.687-010). (Tr. 52–53.)

The ALJ next asked the VE how long an individual can be off task and still retain one of these jobs. (Tr. 53.) The VE testified that such an individual who is off task for 15 percent or more of their eight-hour workday, excluding standard breaks, would be unable to maintain their employment. (*Id.*) Furthermore, the VE explained that an employer may tolerate one or two absences during a 30 to 60-day probationary period, but consistent absences on a recurring monthly basis would also result in the employee's termination. (*Id.*)

Mr. Willis's counsel asked the VE to assume that the hypothetical person would also need occasional redirection from coworkers and supervisors. (Tr. 53–54.) The VE testified that such a limitation would be work preclusive. (Tr. 54.)

**D.  State Agency Consultants**

A disability examiner (Joseph Burrus), a physician (Leon Hughes, M.D.), and a psychologist (George Stern, Ph.D) reviewed Mr. Willis's claim at the initial review level. (Tr. 55–63.)

Dr. Hughes opined that Mr. Willis has no medically determinable physical impairments. (Tr. 57.)

Dr. Stern, in addressing the consultative evaluation, opined that the opinion was partially persuasive but noted that it was "lacking specificity." (Tr. 59.) Dr. Stern wrote that Mr. Willis's intellectual ability and part-time employment was consistent with only moderate limitations. (*Id.*) He indicated that Dr. Faust's opinion was not more restrictive than Dr. Stern's recommended residual functional capacity. (Tr. 60.) Dr. Stern opined that Mr. Willis can learn and recall instructions that can be learned within one month, and that Mr. Willis retains the ability to carry out one to three step tasks in settings that do not demand unusually fast or high production. (Tr. 61.) Dr. Stern found that Mr. Willis can tolerate superficial interactions with coworkers, supervisors, and the public. (Tr. 62.) He can adapt to a setting wherein his duties are routine and predictable. (Tr. 62.)

Based on these opinions, the consultants determined that Mr. Willis could perform the work of a folder (DOT 369.687-018), bagger (DOT 920.687-018), or dust collector operator (DOT 511.482-018) (Tr. 63.) The consultants therefore found that Mr. Willis was not disabled. (*Id.*)

A psychologist (Vicki Warren, Ph.D), a physician (James Cacchillo, M.D.), and a disability examiner (Jeffrey Taylor) reviewed Mr. Willis's claim at the reconsideration level. (Tr. 75–83.)

Dr. Warren wrote that Mr. Willis had not alleged any worsening symptoms or new conditions affecting his ability to work. (Tr. 81.) Further, she affirmed the initial level findings, opining that they were supported and consistent "with the totality of the evidence in file." (*Id.*)

Based on this opinion, the consultants affirmed the initial findings and opined that Mr. Willis could perform the work of a folder, bagger, or dust collector operator. (Tr. 82.) The consultants affirmed that Mr. Willis was not disabled. (*Id.*)

### E. **Relevant Medical Evidence**

#### 1. **Education Records**

Mr. Willis was initially evaluated by Euclid City Schools for special education services in 2008, where he was found to qualify for preschool education services as a student with a Developmental Delay. (Tr. 306.) He was reevaluated multiple times in 2009, qualifying for special education as a student with a Specific Learning Disability. (*Id.*) The results demonstrated that Mr. Willis displayed a disability in the areas of oral expression, written expression, reading fluency, reading comprehension, listening comprehension, and mathematic calculation and problem solving. (*Id.*) Mr. Willis was reevaluated in 2012, 2015, and 2018, each time continuing to qualify under the specific learning disability category. (*Id.*)

A report completed in early 2016 through University Hospitals documented diagnoses of dyspraxia, dyscalculia, a specific learning disability in reading, and a language disorder. (Tr. 318.)

The Euclid City Schools administration completed an Evaluation Team Report ("ETR") regarding Mr. Willis on January 13, 2021. (Tr. 303–36.) He was evaluated for general intelligence by school psychologist Diahna Davis and intervention specialist Aaron Brown. (*Id.*) Ms. Davis noted in the report that Mr. Willis's cognitive ability was measured in the "lower extreme." (Tr. 309.) She wrote that he would need extra time to process information he receives, frequent checks for understanding, and for information to be presented to him in multiple ways. (*Id.*)

7

As part of the January 2021 ETR, Ms. Davis administered the Woodcock-Johnson IV Tests of Achievement (WJIV) to Mr. Willis. (Tr. 312.) The WJIV includes testing on reading, math, and written language skills. (Tr. 313.) Mr. Willis's overall reading skills results fell in the Low range. (Tr. 313.) His overall math skills fell in the Very Low range. (*Id.*).

Mr. Brown assessed Mr. Willis's level of reading comprehension, written expression, and math calculation. (Tr. 310.) Mr. Brown determined that Mr. Willis reads at a fourth grade level, and his most recent Reading Measure of Academic Progress (MAP) placed him in the twelfth percentile when compared to his same age peers and grade level peers. (*Id.*) With respect to written expression, Mr. Brown noted that Mr. Willis is "very good at explaining his thoughts" but has difficulty following grammar and punctuation rules. (Tr. 311.)

Mr. Brown also made mention of Mr. Willis's most recent math MAP assessment, completed in 2019. (*Id.*) Mr. Willis fell in the fifth percentile in overall student achievement when compared to his same age and grade level peers. (*Id.*) Mr. Brown concluded that Mr. Willis would benefit from the opportunity to have "frequent breaks when needed and extended time to complete assignments." (*Id.*)

Mr. Brown relayed information from Mr. Willis's math teacher, attesting to Mr. Willis's high level of determination in completing hard tasks and his strength in solving multi-step problems with 80 percent accuracy. (*Id.*) Moreover, Mr. Willis's math teacher said that he showed leadership skills in the classroom. (Tr. 311.)

The school's Individualized Education Program (IEP) provided Mr. Willis with accommodations, including preferential seating, frequent breaks, and corrective feedback to maintain his on-task behavior. (Tr. 339.)  An executive skills questionnaire administered in December 2021 showed that Mr. Willis has strengths in "goal-directed persistence, flexibility and

time management," and weaknesses in working memory, planning, prioritizing, and organizing. (Tr. 337, 340.)

### 2. Medical Records

Mr. Willis underwent a brain MRI in September 2009 due to a complaint of new onset ataxia. (Tr. 622.) The MRI was unremarkable. (*Id.*)

Mr. Willis was seen by Andrea S. Nikonchik, M.D. on June 13, 2014 for a routine health checkup. (Tr. 445.) Dr. Nikonchik noted that Mr. Willis's family was concerned that he "needs help with being more independent with daily self care skills like coordinating his outfits." (Tr. 445.) But they said he was getting good grades on the IEP and was improving each year with making more friends. (*Id.*) The examination itself was unremarkable, except that Mr. Willis's BMI was below the fifth percentile, and Mr. Willis was instructed to return in a year. (Tr. 446.)

Mr. Willis was seen by Samareh Moussavand, M.D. on May 21, 2015 for an evaluation for autism spectrum disorder, after teachers and a school psychologist voiced their concern. (Tr. 485.) On examination, Mr. Willis made poor eye contact and had poor insight, but otherwise displayed normal behavior and appropriate speech. (Tr. 487.) Dr. Moussavand diagnosed a cognitive disability and noted a "rule out" diagnosis of ASD, level 1; Dr. Moussavand assessed that he displayed "some features of autism." (Tr. 488.) Mr. Willis was referred for neurological testing. (*Id.*)

Mr. Willis was examined by Jane Holan, M.D., on October 26, 2015, with the primary complaint being "difficulty with communication." (Tr. 548.) On examination, Mr. Willis was pleasant and did not interrupt. (Tr. 550.) However, Dr. Holan noted that the family had concerns surrounding Mr. Willis's development since roughly age three or four. (Tr. 548.) They reported that Mr. Willis has some difficulty with feeling overwhelmed and with new transitions, taking a day or two to be comfortable in a new setting. (Tr. 549.) Moreover, Dr. Holan noted that Mr. Willis

9

has hypotonia and secondary fine motor delays. (Tr. 550.) Dr. Holan wrote that Mr. Willis needed further evaluation, but she noted that his achievement test scores were all essentially in the average range. (*Id.*)

Mr. Willis was seen by Dr. Natalie Woods, M.D. on August 13, 2015 for a routine health checkup. (Tr. 513.) His family reported that his academic performance was poor and that an evaluation showed cognitive impairment. (Tr. 514.) His examination was normal, and Dr. Woods wrote that his growth and development were within normal limits. (*Id.*)

Mr. Willis presented to the emergency department on September 10, 2019 due to sustaining a lip laceration. (Tr. 601.) Mr. Willis reported that he was attacked by former classmates when he was walking home from school. (*Id.*) He was treated and discharged on the same day. (Tr. 604.)

Mr. Willis was seen by Raichal Mathew, M.D. on November 4, 2019 for a routine checkup. (Tr. 390.) Dr. Mathew noted that Mr. Willis is overall in good health with a cognitive impairment. (*Id.*) Mr. Willis reported that his development and social interaction is age appropriate, with his school performance at grade level on the IEP. (*Id.*) The examination was normal. (Tr. 391.)

Mr. Willis was seen by Olga Guzovsky, M.D. on December 7, 2021 for immunization and a routine health examination. (Tr. 383.) The examination did not yield abnormal findings, with Dr. Guzovsky again finding that Mr. Willis's "growth and development are appropriate for his age." (*Id.*) Mr. Willis was underweight, but Dr. Guzovsky noted that his weight had been consistent for several years. (*Id.*)

Mr. Willis was seen by Babak Moini, M.D. for a preventive health examination on August 17, 2023. (Tr. 379.) He appeared calm and coherent, with his cognition, memory, and gait all intact. (Tr. 381.)

Mr. Willis underwent a physical examination on September 11, 2023, as part of his disability application. (Tr. 363.) He displayed full muscle strength and dexterity, and his gait and station were within normal limits. (Tr. 363–64.) His range of motion was normal. (Tr. 365–67.) On examination, he was "thin" but well-developed and well-nourished. (Tr. 368.) He made appropriate eye contact and communicated fluently with normal affect. (Tr. 369.) The doctor opined after the examination that "there are no activity restrictions." (*Id*.)

On September 12, 2023, Mr. Willis underwent a psychological evaluation conducted by Michael Faust, Ph.D., a clinical psychologist, as part of his disability application. (Tr. 370.) Kim Thomas, M.A., administered the Weschler Adult Intelligence Scale (WAIS-IV) examination to Mr. Willis as part of the examination. (*Id.*) When asked why he feels limited in his ability to work, Mr. Willis stated that he has "learning issues" and has "difficulty concentrating and following directions." (*Id.*)

Mr. Willis reported having a good relationship with his parents and sister. (Tr. 371.) He had a girlfriend, whom he met online and had not met with in person yet. (*Id.*) He reported working 28 to 30 hours per week and said he was "doing pretty well" at work. (*Id.*) But he said that he had difficulty communicating with his coworkers and bosses. (*Id.*) His mother reported that he has trouble getting to work on time, as he would sometimes fail to communicate to his father that he needed a ride. (*Id.*)

Mr. Willis has never received psychological treatment, is not prescribed any psychiatric medication, and has never been psychiatrically hospitalized. (*Id.*) He described his typical mood as calm and denied experiencing depression or psychotic symptoms such as auditory or visual hallucinations or delusions. (Tr. 372.) He admitted to experiencing anxiety and confusion

sometimes, such as when driving (he had a temporary permit and was learning to drive), and is prone to having panic attacks when he gets lost, which his mother noted happens frequently. (*Id.*)

Dr. Faust noted that Mr. Willis responded to all the questions but "appeared very simple and concrete in his thinking, consistent with limited intellectual functioning and a lack of social understanding." (Tr. 372.) He was also "rather quiet and passive throughout the session and made very little eye contact." (*Id.*) Dr. Faust wrote that Mr. Willis seems to be very dependent on his family for daily assistance. (*Id.*)

He exhibited no difficulty understanding simple questions but struggled with complex instructions and did not understand verbal cues. (Tr. 373.) Mr. Willis appeared on edge during the examination, but he showed an "adequate" frustration tolerance for mental status tasks, demonstrating consistent persistence. (*Id.*) When presented with hypothetical situations, Mr. Willis responded with limited social judgment. (*Id.*) His intelligence testing showed a verbal comprehension score of 80, a perceptual reasoning score of 65, a working memory score of 71, and a processing speed score of 62, resulting in a full-scale IQ of 65, all significantly lower than the average for his age level. (Tr. 374.) Dr. Faust wrote that "his performance placed him within the extremely low range of ability," consistent with an intellectual disability. (*Id.*)

Dr. Faust diagnosed autism spectrum disorder and a mild intellectual disability, with "significant deficits in communication, development, and socialization." (Tr. 375.)

Dr. Faust opined that Mr. Willis has "limitations in his ability to understand, follow, and remember written and verbal instructions for task completion due to limited intellectual capacity and clinical observations of his performance in this exam." (*Id.*) He wrote that Mr. Willis does not have limitations in persistence, work pace, or attention and concentration, although he noted that Mr. Willis displayed a slow work pace during the examination. (*Id.*) He opined that Mr. Willis

12

"can be expected to exhibit difficulty in responding to supervision and coworkers in a work setting." (*Id.*) And he wrote that Mr. Willis has "limitations in his ability to respond appropriately to work pressures in an employment setting . . . ." (*Id.*) Dr. Faust determined that Mr. Willis would not have the mental ability to manage his funds if he is awarded benefits. (Tr. 376.)

## IV.    THE ALJ'S DECISION

The ALJ found that Mr. Willis meets the insured status requirements of the Social Security Act through June 30, 2025. (Tr. 17.) The ALJ further found that the claimant has not engaged in substantial gainful activity since September 15, 2003, the alleged onset date. (*Id.*)

The ALJ next determined that Mr. Willis has the following severe impairments: (1) Autism Spectrum Disorder; and (2) Intellectual Disorder. (Tr. 18.)

The ALJ then concluded that none of Mr. Willis's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. Willis has the residual functional capacity ("RFC") to perform work at all exertional levels with a number of limitations. (Tr. 21.)

With respect to environmental limitations, Mr. Willis can meet production requirements that allow a flexible and goal-oriented pace. (*Id.*). He can understand, remember, and carry out simple instructions, but he cannot perform work requiring a specific production rate pace, such as assembly-line work or an hourly production quota. (*Id.*) Mr. Willis can maintain the focus, persistence, concentration, pace, and attention to engage in work tasks for two-hour increments, in eight-hour workdays, within the confines of normal work breaks and lunch periods. (*Id.*) He can deal with occasional changes in a routine work setting, and can handle occasional interaction with supervisors, coworkers, and the general public. (*Id.*)

The ALJ found that Mr. Willis did not have past relevant work. (Tr. 26.) Though he has maintained employment, the work did not amount to substantial gainful activity. (*Id*.)

The ALJ concluded that Mr. Willis has at least a high school education and was less than a year old on the alleged disability onset date. (*Id*.)

The ALJ then determined that—considering Mr. Willis's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a "warehouse worker" (DOT 922.687-058), "linen room attendant" (DOT 222.387-030), and "counter supply worker" (DOT 319.687-010). (Tr. 27.) Accordingly, the ALJ found that Mr. Willis was not disabled. (*Id*.)

## V.    LAW AND ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as

14

a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B. Standard for Disability

To establish entitlement to DIB, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims for both DIB and SSI follows a five-step review process. 20 C.F.R. § 404.1520.[2] First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that significantly limits…physical or mental ability to do basic work activities." *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 C.F.R Part 404, Subpart P, Appendix I, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's RFC, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). An RFC is "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (e.g. 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

16

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at \*17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on the [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at \*17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g). *See Abbott*, 905 F.2d at 923.

### C. <u>Analysis</u>

In his sole assignment of error, Mr. Willis contends that the ALJ erred by accepting the RFC recommended by the state agency consultants, and rejecting the opinion of Dr. Faust, without first recontacting Dr. Faust for clarification about his terminology or obtaining a new consultative examination. (ECF No. 9, PageID# 8–9.) Mr. Willis then briefly argues that, in any event, the ALJ's discussion of Dr. Faust's opinion does not adequately address supportability and consistency. (*Id.*, PageID# 10.)

The ALJ discussed Dr. Faust's medical evidence of impairments and opinion evidence as follows:

17

The claimant presented to a psychological consultative evaluation on September 12, 2023. . . .

On examination during the psychological consultative evaluation, the claimant presented with good appearance, responded to all questions but appeared with very simple and concrete thinking, was quiet, passive, and made little eye contact, struggled to offer details, exhibited no articulation problems but would stammer at times, speech was 100 percent intelligible, and he had no difficulty understanding very simple questions, although had difficulty with complex instructions. The claimant presented as cooperative but showed little emotional expression and appeared agitated with pressured speech, socially awkward, on edge, and self-conscious over interactions, responses, and test performances. He exhibited adequate frustration tolerance for mental status tasks, worked on tasks until completion, and remained persistent. Thought processes were very simple and concrete but logical, linear, and reality bound with no evidence of internal stimuli, tracking conversation, psychotic symptoms, delusions, obsessions, guardedness, suspiciousness, or paranoia. Mental status examination also indicated the claimant was oriented and was able to complete simple computations and repeat six digits forward and three digits backward but not more advanced or serial 7s or 3s without error . . .

[T]he medical record does not establish functional limitations that would preclude the restrictions [in the RFC]. Despite allegations of limitations, examinations and tests showed symptoms generally controlled. The claimant maintained intact system functioning as demonstrated during examinations that showed minimal changes and the ability to interact with cooperative behavior, full orientation, and ability to provide information, answer questions, and understand instructions and treatment plans. Despite a cognitive impairment, the claimant has the ability to engage in daily tasks and recreational activities for enjoyment, such as playing video games, reading, and interacting with peers online. . . . [T]he longitudinal record does not reflect a significant degree of functional limitation from the claimant's impairments. Treatment notes and examination findings do not support loss of functioning that would support a disabling degree of limitation.

. . .

Dr. Faust opined the claimant has limitations in his ability to understand, follow, and remember written and verbal instructions for task completion due to limited intellectual capacity and clinical observations of his performance in the exam; is not viewed to have limitations in persistence, work pace, attention, and concentration, consistent with an intellectual disability and an Autism Spectrum Disorder; can be expected to exhibit difficulty in responses to supervision and coworkers in a work setting

18

secondary to his intellectual disability as well as Autism; and is viewed to have limitations in his ability to respond appropriately to work pressures in an environment setting due to Autism and intellectual disability and would need a payee. The undersigned finds Dr. Faust's opinion not fully persuasive because it contains imprecise terminology and did not properly quanti[f]y abilities and limitations.

(Tr. 22–26) (citations to the record omitted) (line breaks added for readability).

The Commissioner defends the ALJ's reasoning and conclusions, arguing that the ALJ had no obligation to further develop the record or recontact Dr. Faust, despite finding his opinion less than fully persuasive. The Commissioner points out that the burden of providing medical evidence to establish the severity of an impairment and its effects on functioning rests squarely with a claimant. The Commissioner emphasizes that the ALJ has broad discretion to determine whether additional evidence is necessary, and is only required to seek more information if the existing evidence is insufficient to reach a conclusion. And the Commissioner points to the administrative hearing, where Mr. Willis's counsel explicitly confirmed that the record was complete and there were no outstanding records. Relying on *Campbell v. Comm'r of Soc. Sec.*, No. 1:12-cv-1406, 2013 WL 1908145, at *8 (N.D. Ohio May 7, 2013), the Commissioner asserts that an ALJ may reasonably rely on such unambiguous statements and that a claimant cannot "rest on the record and later fault the ALJ for not performing a more exhaustive investigation." (Comm'r's Br. at 5–6, ECF No. 10, PageID# 676–77.)

In reply, Mr. Willis contends that his hearing attorney's statement regarding a complete record was a procedural formality, relating only to the disclosure of known evidence, rather than a waiver of the ALJ's duty to ensure the record is complete. Mr. Willis distinguishes this case from those where a representative failed to request a Consultative Examination (CE). (Pl.'s Reply Br. at 2–3, ECF No. 11, PageID# 682–83) (citing, *e.g.*, *Butcher v. Comm'r of Soc. Sec.*, No. 5:23-CV-02451, 2024 WL 4891882, at *13 (N.D. Ohio Nov. 26, 2024), *report and recommendation*

19

*adopted*, 2025 WL 20756 (N.D. Ohio Jan. 3, 2025)). Mr. Willis argues that counsel could not have anticipated that the ALJ would find Dr. Faust's opinion vague until the final decision was issued.

Mr. Willis further cites the SSA's Hearings, Appeals, and Litigation Law Manual (HALLEX) in arguing that the ALJ was required, once Dr. Faust's opinion was deemed vague, to seek another evaluation. (Pl.'s Merit Br. at 11, ECF No. 9, PageID# 668.)

After careful consideration, the Court finds that the ALJ did not abuse her discretion when she decided not to obtain further medical evidence. The Court further finds that, reading the decision as a whole and with common sense, the ALJ adequately addressed the supportability and consistency of Dr. Faust's opinion.

The Commissioner is correct that it is a claimant's responsibility to provide a complete record, especially in circumstances where, as here, they are represented by counsel. *See, e.g.*, *Watkins v. Astrue*, No. 1:10CV486, 2011 WL 4478487, at *6 (N.D. Ohio Sept. 26, 2011).

"An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917). The Court therefore reviews the ALJ's decision not to obtain an additional consultative expert or seek further information from Dr. Faust for abuse of discretion. *Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 304 (6th Cir. 2019) (citing *Halter*, 279 F.3d at 356).

Mr. Willis essentially argues that the ALJ abused his discretion by: (1) finding Dr. Faust's opined limitations to be imprecise, in that they did not specifically quantify Mr. Willis's abilities and limitations; (2) deciding to find the opinion less than fully persuasive as a result, instead of inquiring of Dr. Faust for more information or seeking a new examination; and (3) thereafter relying on the state agency consultants' opinions in crafting the RFC.

20

In arguing that the ALJ was required to obtain additional evidence here, Mr. Willis points to HALLEX I-2-5-20(E)(1) (renumbered to HA 01250.020 in the agency's Programs Operations Manual System) and 1-2-5-14(C)(3) (renumbered to HA 01250.014). These are policy guidance documents that state that "If the DDS . . . provides a CE report that is inadequate or incomplete," the hearing officer should contact the state agency and try to resolve the problem. HA 01250.020(E)(1); HA 01250.014(D)(3).

Although HALLEX describes policies that ALJs should follow when conducting hearings and reviewing a claimant's case, HALLEX's procedural guidance is not binding on this court. *See Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008); *Workman v. Comm'r of Soc. Sec.*, No. 3:20-CV-01821, 2021 WL 8342810, at *12 (N.D. Ohio Nov. 15, 2021); *Robberts v. Comm'r of Soc. Sec.*, No. 2:18-cv-541, 2019 WL 4023549, at *7 (S.D. Ohio Aug. 26, 2019) ("Importantly, HALLEX is an internal guidance tool that does not have the force of law . . . . Indeed, HALLEX does not impose judicially enforceable duties on either the ALJ or this Court.")

But even if the HALLEX and POMS provisions were binding on this Court, Mr. Willis cannot demonstrate that the ALJ violated these policies. Under POMS DI 22510.015(B), a consultative examination is considered complete if it includes a medical opinion from the examiner regarding the claimant's functional limitations, or if those limitations can be reasonably ascertained from the report as a whole. POMS DI 22510.015(B)(2)–(3)

Here, while Dr. Faust did not state with particularity the *extent* of Mr. Willis's functional limitations, the report was not so deficient that a conclusion could not be reached. Rather, the ALJ was able to evaluate the narrative findings and weigh them against other evidence in the record, including Mr. Willis's educational records, work history, activities of daily living, and the prior administrative medical findings of the state agency psychologists.

21

Additionally, this is not a case where the record contained inconsistencies. *See* 20 C.F.R. § 416.920b(b). To the contrary, the Court finds that the ALJ's conclusions with respect to moderate limitations are well supported by the record, including by the educational records (which, as the ALJ pointed out, show Mr. Willis steadily improving through the IEP such that he attended college courses and intended to seek business education), Mr. Willis's work history, his testimony (including that he believed he could work full-time), his function report and activities of daily living, and the lack of significant medical or psychological attention over the years. The ALJ carefully and sensitively reviewed this evidence and found that it was sufficient to determine, even with Dr. Faust's opinion, an appropriate RFC for Mr. Willis. The Court cannot find an abuse of discretion under those circumstances.

Finally, the Court agrees that the ALJ's decision should also not be reversed where Mr. Willis's counsel reviewed the report and, at the hearing, confirmed that the record was complete. In light of that position, and because the ALJ was able to make a logical connection between the existing evidence and the RFC determination, there was no abuse of discretion in coming to a final decision without further development of the record.

Mr. Willis's remaining argument as to the ALJ's evaluation of Dr. Faust's opinion— addressed to the supportability and consistency factors—also fails.

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c).

Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination how [the ALJ] considered all of the factors for all of

the medical opinions and prior administrative medical findings in your case record." 20 C.F.R §
404.1520c(b)(1).

Of the five factors, supportability and consistency are the most important, and an ALJ must
explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not
required to" explain how the ALJ considered the remaining factors. *Id*.

The "supportability" factor looks to how well the medical source supports the opinion with
objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(1). "In other words, the
supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v.
Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting
*Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31,
2022)).

The "consistency" factor looks to how consistent the medical opinion is with evidence from
other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ
discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions
with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision."
*Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910 at *4 (N.D. Ohio
May 13, 2022).

Mr. Willis points to one sentence from the ALJ's decision: "The undersigned finds Dr.
Faust's opinion not fully persuasive because it contains imprecise terminology and did not properly
quanti[f]y abilities and limitations." He argues that this statement fails to adequately address
supportability and consistency. But an ALJ's reasoning need not be contained in "tidy packaging."
*Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678 (7th Cir. 2010). The decision must be

23

read as a whole and with common sense. *E.g., id.*; *see also Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, at *8 (N.D. Ohio Sept. 30, 2021).

Here, reading the opinion as a whole and with common sense allows the Court to trace the ALJ's reasoning and conclusions on supportability and consistency. As an initial matter, the Commissioner is correct that the Sixth Circuit has regularly held that an ALJ is permitted to discount an opinion as vague or imprecise when it fails to provide useful, objective, measurable guidance as to the claimant's specific limitations. *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 122 (6th Cir. 2016) (the medical source had had limited the claimant from "excessive" bending, kneeling, or squatting, without quantifying the amount of time the claimant could do those things); *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018) (opinion did not actually describe any specific functional limitations). Thus, this Court has repeatedly held that it is not reversible error "when the ALJ [finds] an opinion vague based on a failure to propose specific limitations." *See Baker v. Comm'r of Soc. Sec.*, No. 1:23-CV-01988, 2024 WL 3091042, at *10 (N.D. Ohio June 21, 2024); *Workman v. Comm'r of Soc. Sec.*, No. 3:23-CV-01167-JRK, 2024 WL 2941180, at *7–8 (N.D. Ohio Apr. 26, 2024), *report and recommendation adopted*, 2024 WL 2873278 (June 7, 2024).

It is difficult to argue with the ALJ's characterization of Dr. Faust's opinion. Dr. Faust opined that Mr. Willis has "limitations in his ability to understand, follow, and remember written and verbal instructions for task completion due to limited intellectual capacity and clinical observations of his performance in this exam." (Tr. 375.) He opined that Mr. Willis "can be expected to exhibit difficulty in responding to supervision and coworkers in a work setting." (*Id.*) And he wrote that Mr. Willis has "limitations in his ability to respond appropriately to work pressures in an employment setting . . . ." (*Id.*) But beyond identifying that there were limitations,

24

Dr. Faust did not define what Mr. Willis remained able to do at work. Courts have found that an ALJ does not err in finding such opinions less than fully persuasive based on vagueness. *E.g.*, *Baker*, 2024 WL 3091042, at *10.

Nevertheless, there are additional reasons to find no reversible error here. First, the ALJ addressed all three of Dr. Faust's opined limitations when developing the RFC. Specifically, she limited Mr. Willis to work requiring only simple instructions (without a production rate pace), for two hours at a time in a normal workday, where his work would require only occasional changes and where he would only have to interact with others occasionally. Dr. Faust did not opine on a specific, more restrictive functional limitation.

Courts have held that an ALJ's failure to sufficiently articulate consideration of supportability and consistency is harmless where the ALJ actually adopts the opinion at issue. *See Troyan v. Comm'r of Soc. Sec.*, No. 1:24-CV-02040-DAP, 2025 WL 2437255, at *12 (N.D. Ohio Aug. 25, 2025) (collecting cases). Here, the ALJ did not find Dr. Faust's opinion to be completely unpersuasive; she found it to be less than fully persuasive. And the ALJ proceeded to adopt limitations in all the areas identified by Dr. Faust. As there is no specific, more restrictive functional limitation provided in Dr. Faust's opinion that the ALJ rejected, any error in her consideration of the relevant factors is harmless.

But to the extent that the ALJ's RFC differs from Dr. Faust's opinion, the ALJ adequately addressed that difference when reading the decision as a whole and focusing on the consistency factor. The ALJ reasonably acknowledged that she was "cognizant that the degree of limitation that an individual might experience from impairments might not necessarily be reflected in a particular treatment note." (Tr. 24.) But the ALJ found that here that "the longitudinal record does not reflect a significant degree of functional limitation from the claimant's impairments." (*Id*.) In

25

discussing the Paragraph B criteria, she specified that she found no more than a moderate limitation in any relevant area.

With respect to understanding, remembering, and applying information, the ALJ acknowledged that Mr. Willis received special education services for a learning disability, but she accurately noted that he prepares simple meals; does laundry and simple household chores and yard work; reads; reported in the function report that he can pay bills, count change, and handle a savings account; and is able to navigate public transportation. (Tr. 18.) She noted that he was consistently coherent and literate on examination. (*Id.*)

With respect to interacting with others, the ALJ acknowledged reports of a limited social life and some social difficulty while in school and past anxiety around others. (Tr. 19.) But she accurately recounted that Mr. Willis currently goes to the movies with his father, socializes via text messaging, gets along with authority figures, and showed fluent speech and calm, cooperative behavior on examination. (*Id.*)

With respect to concentrating, persisting, or maintaining pace, the ALJ noted that Mr. Willis at times demonstrated difficulty with concentration, but she pointed out that he routinely presented as alert and oriented and reported that he performs simple household chores and yard tasks, reads, and watches television. (*Id.*)

And as for adapting or managing oneself, the ALJ accurately noted that Mr. Willis manages his own personal needs and said he can handle some changes in routine but does not handle stress well. (*Id.*) The ALJ further noted that, during examinations, he presented as well-developed and well-nourished with calm, cooperative behavior. (*Id.*)

Later in the opinion, the ALJ accurately summarized Mr. Willis's academic records and noted that, at Dr. Faust's evaluation, Mr. Willis reported socializing with a girlfriend online. (Tr.

26

22.) The ALJ accurately summarized Dr. Faust's examination findings and the medical evidence in the record and reasonably concluded that Mr. Willis retains "the ability to interact with cooperative behavior, full orientation, and ability to provide information, answer questions, and understand instructions and treatment plans." (Tr. 22–24.) The ALJ further reasonably concluded that "[d]espite a cognitive impairment, [he] has the ability to engage in daily tasks and recreational activities for enjoyment, such as playing video games, reading, and interacting with peers online." (Tr. 24.)

Accordingly, the Court is convinced that the ALJ considered all the relevant evidence, both medical and non-medical records, and had sufficient evidence upon which to develop an RFC. The ALJ did not abuse her discretion in issuing a final decision without further development of the record, reasonably found Dr. Faust's opinion not fully persuasive for vagueness but nevertheless adopted limitations in every area recommended by Dr. Faust, and any discrepancy between the opinion and the RFC was adequately explained by reference to supportability and consistency.

## VI. CONCLUSION

For the reasons discussed above, the Court AFFIRMS the Commissioner's final decision.

Dated: July 29, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge